Arnold Levy v. Commissioner. Louise B. Levy v. Commissioner.
Levy v. Commissioner
Docket Nos. 31256 and 31257.
United States Tax Court
1953 Tax Ct. Memo LEXIS 345; 12 T.C.M. (CCH) 235; T.C.M. (RIA) 53074; March 9, 1953
*345 Deductions: Business expense: Loss. - Petitioner, in the jewelry and antique business, occupied premises under a five-year lease. Lessor was obligated to make major repairs. In 1946 the roof began to leak and upon investigation was found to be in unsafe condition because of gradual deterioration. With the lessor's consent, petitioner undertook to see that repairs were made. A controversy developed over the cost which the lessor thought was excessive. Thereupon, petitioner paid $21,721.91 for same in 1946. No attempt was made to collect from the lessor. Petitioner purchased the leased premises in 1947. Held, petitioner was not entitled to a deduction of the amount paid as casualty loss or business expense in 1946. Edward J. Nelson, Esq., and James I Keller, C.P.A., 1701 du Pont Building, Miami, Fla., for the petitioners. F. L. Van Haaften, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These consolidated proceedings involve income tax deficiencies for the calendar year 1946 in the amounts of $6,060.07 determined against Arnold Levy and $6,251.36 determined against Louise B. Levy. In both proceedings the issue *346 presented is whether the respondent, in determining the petitioners' distributive shares of the net income of a partnership, erred in disallowing a claimed deduction of $21,721.91 as a business expense or loss on account of expenditures for alleged emergency repairs on leased premises occupied by the partnership business. Findings of Fact The petitioners Arnold and Louise B. Levy are husband and wife. During the taxable year 1946 they were equal partners in a business conducted at Miami Beach, Florida, under the firm name of Antique Dome engaged in the retail sale of antiques, art works, and jewelry. For the year 1946 each petitioner filed a separate individual income tax return on Form 1040. The partnership Antique Dome kept its books on the accrual and calendar year basis and on that same basis filed a 1946 partnership return of income on Form 1065. Those returns were filed with the collector of internal revenue for the district of Florida. Prior to 1929 the petitioners operated their business on Flagler Street, Miami. In 1929 Calvin P. Bentley of Detroit, Michigan, erected a store building at 910 Lincoln Road, Miami Beach, especially for petitioners who leased the premises *347 for business purposes for a term of five years. Throughout the following years, including 1946, the petitioners' partnership business continuously occupied those premises under a succession of five-year leases which varied as to rental and other terms. On April 30, 1945, Bentley as the landlord and Arnold and Louise Levy doing business as "Antique Dome" as the tenants, executed a lease for the building at 910 and the building in the rear thereof at 910-1/2 Lincoln Road for a term of five years from September 1, 1945 to August 31, 1950, at a total rental of $25,000 payable $1,000 on the first day of January, February, March, April, and May of each year ($5,000 per annum) beginning January 1, 1946. In addition to the rental and as part of the consideration for the lease, the tenants agreed, inter alia, to pay all taxes levied on the premises, and to carry fire and extended coverage insurance on 910 Lincoln Road in the amount of $25,000 and 910-1/2 Lincoln Road in the amount of $5,000. In addition to various covenants as to use and occupancy of the premises, etc., the lease provided, in part, as follows: "In the event the buildings on the premises hereby demised, or any part thereof, *348 shall be destroyed or so damaged by fire or other casualty during the term of this Lease as to be untenantable, then the lessor shall have the option to terminate this Lease, or to repair or rebuild the damaged premises and put them in tenantable condition, remitting the rents hereby reserved, or a fair and just proportion thereof according to the damage sustained, until the said premises are made fit for occupancy and use, notice of the lessor's option in any event to be given to the Tenants in writing within ninety days from the date of such damage or destruction. "The Tenants will pay all charges for light, power and water and will make any and all repairs at their own expense and no removal of partitions or changes in the interior arrangement, duration, or construction of the buildings on said premises shall be made without the written consent of the Landlord. However, all repairs shall not be construed as requiring the Tenants to rebuild the roof or walls or to replace rafters or to make like major repairs." The building number 910 fronting on Lincoln Road was approximately 40 feet wide and 80 feet long erected on reinforced footings and constructed of concrete block walls *349 with pilasters. The structure had a balcony extending over a portion of the ground floor. The roof was low peaked from the center to the sides of the building to provide drainage and the covering was some sort of roofing paper or composition. The roof and the ceiling were supported by seven wooden trusses having a 40-foot span. The bottom or main beams of the trusses extended below the ceiling and were boxed in and plastered to match the ceiling. The structure, which cost about $23,000 to build, was used continuously by petitioners for displaying and selling merchandise from 1929 to about May 1946 without any substantial repairs or replacements. At the rear of that structure there was a two-story building known as 910-1/2 Lincoln Road. For several years prior to 1946 there was a noticeable sag in the center of the 40-foot trusses and the plaster boxing around the main beams thereof showed a tendency to crack open. At the time the above-mentioned lease was entered into on April 30, 1945, it was known that the roof was in need of some repairs, but the extent thereof had not been determined. In May 1946 the roof leaked and an inspection of the roof by John L. Berry, a general contractor, *350 disclosed that the central portion of the roof had sagged to a point where instead of a low peak to shed water there was a depression which accumulated rain water and, also, that the roof was shaky to walk on. Berry advised that there was no use trying to stop the leak without first determining the actual condition of the sagging trusses. Barry knocked out some of the plaster around the main beams of several trusses and found one beam had cracked and he immediately shored it up with eight by eight supports to prevent possible collapse. In other trusses there was a deflection or sag of about three or four inches. Petitioner Arnold Levy went to see Bentley, the landlord, who lived in Florida part of the year, and explained the condition of the roof. Bentley told Levy to go ahead and see what work had to be done and attend to fixing the roof. Shortly thereafter Levy met Bentley and the latter's son-in-law Al Smith in the bank. Levy asked Bentley to look at the condition of the building and to have Al Smith handle the repair job, but Bentley refused and instructed Levy to go ahead and handle the whole job. Levy asked if he should pay the bills and be reimbursed by Bentley and the latter *351 instructed him not to pay the bills but to send them to Detroit and the Detroit Trust would pay them as they came due. Berry, the contractor, feared that a storm or heavy rainfall might collapse the roof and advised Levy to move his merchandise out of the building, which was done. Also, at Berry's insistence Levy procured the services of a Miami Beach engineering firm to determine the extent and nature of the necessary repairs or replacement of the trusses. The Building Department of the City of Miami Beach was notified and the chief building inspector determined that the condition of the roof was such as to make the building unsafe for use. The engineers drafted plans and specifications to strengthen the wooden trusses rather than rebuild the roof. The plans called for cradling each truss between two L-shaped steel channels, bolted together at frequent intervals with the ends resting on steel bearing plates on the pilasters. Under date of May 28, 1946, Arnold Levy executed and filed with the National Production Authority an application for authority to strengthen the roof trusses with steel in the described manner and stated the estimated total cost of that project at $4,000. *352 That application was granted and the steel was ordered. Sometime after May 1946 Bentley returned to Detroit. When Berry, the contractor, requested the first payment of $6,000 so he could pay for the steel, Bentley was notified thereof. Bentley did nothing about paying that $6,000 bill. Under date of June 24, 1946 and July 1, 1946, respectively, Bentley wrote the following two letters to Levy: "Mr. Arnold Levy: "Needless to say I was much surprised to hear from Al that the cost of fixing the roof on Antique Dome was running $12,000.00 or more. Do you realize that this is more than 2 1/2 years rent? "I feel that you should never have obligated me for such amount without taking the matter up with me first. When you stop to think of it, the building only cost a little over $23,000.00, and it will cost half of the price of the building to fix the roof. I think it is entirely out of reason. I don't know what can be done about it now, but I certainly am very much disappointed. "I got your telegram last Friday in Detroit about buying the building. You know I am not anxious to sell the building and if I did, it would be only for cash." Very truly yours," "Dear Arnold: "I have *353 your letter of the 28th with explanations and I still feel that putting 12-18inch beams across the top of the Antique Dome to hold the roof at the price of $12,000 is altogether too much and I still feel that you should have taken the matter up with me one way or the other and let me know definitely about going into a much larger proposition than we figured. "Of course your statement about my paying any labor repairs is correct. I have never intimated any other understanding, but I believe that things could be fixed up at a much cheaper price than the costs which you have sent me. We are using I beams here at the factory and I cannot understand any such price. However, I can't see that the matter can be helped now. "When the bills are all in, kindly send them to the Detroit Trust Company. Very truly yours," Levy was anxious to have the work completed as rapidly as possible so he could move back into his long established place of business prior to the start of the next winter season and, also, he was desirous of avoiding any friction or possible suits over nonpayment of the repair bills as they were presented. Levy paid the contractor's first bill for $6,000 and thereafter paid *354 all the bills for materials, labor, etc. as they were presented until completion of the job in October 1946. Levy paid out a total of $21,721.91 for the cost of all the work done on the leased premises for which he was to be reimbursed by Bentley. Levy advised Bentley, the owner, as to such costs, but he never received any reply or reimbursement from Bentley during 1946. In the middle of December 1946 and in connection with securing new insurance on the buildings on the leased premises, Levy wrote to the Detroit Trust Company expressing his desire for a quick settlement of the amount Bentley owed him on account of the aboue mentioned expenditures. The work done on the leased premises with respect to the trusses included, inter alia, removal of the boxing and plaster around the trusses; the removal of at least portions of the ceiling; the reaising of the trusses and roof; the hoisting of 18 inch wide L-shaped steel channels in place so that the ends of the bottom flanges rested atop the walls and the sides and bottom of the wooden trusses were encased in steel; and the welding of the edges of the flanges under the wooden trusses and also the placing of bolts through the steel channels *355 and wooden trusses to provide for greater strength. The steel cost $3,758. Additional costs included the structural engineering fee, labor, miscellaneous materials, etc. The work done with respect to the roof included, inter alia, the removal of the roofing material down to the sheathing boards and applying felts and gravel covering; installing and sealing flashing; removal of hood barrel tile coping and re-laying after roofing, removal of two skylights and replacing after roofing; installing copper outlets, etc. New roofing material was also put on the two-story building in the rear. The roofing bills amounted to $2,100. The work done on the interior of the building included, among other things, lathing and plastering including ornamental work covering the beams at a total cost of about $6,963; installing and/or relocating electric wiring, outlets, switch panels and fluorescent lighting fixtures at a total cost of about $2,185; installing partly asphalt tile and partly terrazzo chip flooring and cleaning and polishing at a total cost of about $1,030; and painting exterior front cornice and entrance and interior balustrade and woodwork at a cost of $705. Lumber and other materials *356 used, drayage, insurance, etc. cost varying amounts. The extensive work completed during 1946 on the leased premises was done for and on behalf of the owner thereof. The structural weakness of the roof trusses was a cumulative thing resulting from deterioration over a period of time and was known to be in need of some repair when the lease of April 30, 1945, was entered into. The work, in toto, done on the building in 1946 prolonged the useful life and materially increased the value thereof and constituted a rehabilitation of the building. The expenditures were for capital improvements. During the summer of 1946 Levy started negotiations for the purchase of the leased premises and made an offer of $100,000. Sometime in the fall of 1946 Bentley agreed to sell the property for $120,000 which was the then market value as appraised by Bentley's son-in-law Al Smith. The agreed sale price was not diminished by the cost of the improvements paid for by Levy on behalf of Bentley and for which Levy had not been reimbursed. A sales contract was entered into toward the end of 1946 and Levy's deposit was placed in escrow pending the clearing up of some title technicality because a third party *357 had at one time owned part of the land. On January 2, 1947, Bentley executed a warranty deed to Arnold and Louise Levy for the leased premises in consideration of payment of $45,000 plus a purchase money mortgage for $75,000, payable $7,500 a year for ten years. At that time the lease on the premises would have run until August 31, 1950, and the rental payments thereunder would have amounted to $20,000. On the partnership return of income for 1946 a deduction of $21,721.91 was claimed with the following explanation: "THIS AMOUNT WAS EXPENDED IN ORDER TO PROTECT THE BUSINESS OF THE TAXPAYER AND WAS CAUSED BY A SUDDEN CASUALTY TO THE PREMISES IN WHICH THE TAXPAYER DID BUSINESS AND WAS NOT REIMBURSED BY THE LESSOR. THE AMOUNT WAS ALSO PAID IN LIEU OF LITIGATION AND IN ADDITION THE VALUE OF THE EXPENSE TO THE TAXPAYER WAS EXTINGUISHED UPON THE EXPIRING OF THE LEASE AND PURCHASE OF THE PROPERTY JANUARY 1, 1947…" The expenditures in question made by Arnold Levy in the total amount of $21,721.91 during 1946 for permanent betterment and improvement of the leased premises, for and on behalf of the owner thereof, did not constitute emergency or other business expenses of the partnership *358 Antique Dome. Opinion Our conclusion of fact that the expenditures in question did not constitute business expenses of the partnership during 1946, is dispositive of the issue involved herein, which is essentially a question of fact. The record is clear that the expenditures were for permanent betterment and improvement of the leased premises; that is, capital improvements, for which the owner was admittedly obligated but which petitioner Arnold Levy volunteered payment with the expectation of reimbursement. At the end of the taxable year 1946 petitioners were still the lessees of the improved premises and the owner thereof was, so far as this record shows, still obligated to reimburse them for those expenditures. The petitioners' purchase of the premises at an agreed price of $120,000 in the following year 1947 does not alter the factual circumstance existing during the taxable year 1946 here in question which, boiled down, is simply that the owner of the leased premises owed petitioners for the cost of the improvements. For the year 1946 there is no factual basis for an allowable *359 deduction either as a business expense because of emergency repairs, an expense to protect the business, a casualty loss, or, an expenditure the benefit of which was extinguished upon cancellation of a lease, as variously contended by petitioners, and the authorities cited on brief are not applicable here. The respondent's determination is sustained. Decision will be entered for the respondent.